Leah S. Freed, Bar #021332
*Leah.Freed@ogletreedeakins.com*
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
2415 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone: (602) 778-3700

Randall E. Kahnke, Minn. #202745, *admitted pro hac vice*
*randall.kahnke@FaegreBD.com*
Martin S. Chester, Minn. #31514X, *admitted pro hac vice*
*martin.chester@FaegreBD.com*
Faegre Baker Daniels LLP
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000

Attorneys for Plaintiff Honeywell International Inc.

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| **Honeywell International Inc.,** | Case No. 2:17-cv-00699-ROS |
| Plaintiff, | **PLAINTIFF'S MOTION AND MEMORANDUM FOR *EX PARTE* INJUNCTIVE RELIEF** |
| v. | |
| **Robert Jeremy Miller,** | Oral Argument Requested |
| **Defendant.** | |

Defendant Robert Jeremy Miller knows about this lawsuit and has been evading service for almost a week. Honeywell is suffering irreparable harm and needs immediate, *ex parte* injunctive relief to prevent that harm from continuing.

**Miller is Evading Service**

Honeywell filed its Complaint on March 8, 2017 and immediately attempted to

1

serve Miller, only to learn that he had just moved. (Aff. of John A. Demarr ¶¶ 3-5 & Ex. A.) On March 10, 2017, Honeywell filed a TRO motion, and its process servers contacted Miller by phone. (*Id.* ¶¶ 6, 8.) Miller answered, and agreed to meet Honeywell's server to accept service, but then failed to show up. (*Id.* ¶ 9.) On March 13, 2017, Honeywell sent Miller an email with copies of the Summons, Complaint, and all the TRO papers. (1st Chester Dec. ¶¶ 2-3 & Ex. A.) Miller has repeatedly been given notice of this action and this motion, but he has shown that he is determined to avoid formal service.[1] The Court should not allow Miller's gamesmanship to prevent Honeywell from seeking immediate relief. Honeywell respectfully asks to be heard immediately.

**<u>Honeywell is Suffering and Will Continue to Suffer Irreparable Harm</u>**

Miler stole Honeywell trade secrets and confidential information, and has clearly shown that he will disclose that information if it benefits him. He has already disclosed Honeywell Confidential Information in trying to get a job with Blue Sky Network ("BSN"). Honeywell has learned from BSN's counsel, however, that Miller did not begin work for BSN, and will not be working for BSN. (2d Chester Dec. ¶ 6.) This increases the danger to Honeywell; Miller is now a "loose cannon," possessing Honeywell's competitively-valuable information, ready to use it to help himself and harm Honeywell. Honeywell is currently suffering irreparable harm for several reasons, including:

- Miller locked Honeywell out of its Constant Contact customer database, harming Honeywell's ability to communicate important information to its customers. (Ronis Dec. ¶¶ 11-12) [Docket #12].

---

[1] The previously-filed Affidavit of John A. Demarr, P.I. [Docket #23] describes in detail Honeywell's efforts to serve Miller. Honeywell will also promptly provide email copies of this Memorandum and related filings to Miller by email. (2d Chester Dec. ¶ 4.)

2

- Miller stole information related to Honeywell's most important Sky Connect customers, and—given his willingness to share information with BSN—will likely use and disclose the information to other competitors. (Ronis Dec. ¶ 13.)

- The information that Miller stole is highly valuable to Honeywell's competitors, and disclosure will cause Honeywell irreparable harm. Ronis Decl. ¶ 14.)

**Honeywell Seeks Narrow, Limited Immediate Injunctive Relief**

The Ninth Circuit makes clear that Rule 65 is designed to restore "the last uncontested status that preceded the parties' controversy." *Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)). That is what Honeywell now seeks *ex parte*:[2]

1. Order Miller not to use or disclose any of Honeywell's Trade Secrets, Proprietary and Confidential Information until the Court makes a determination on the merits.

2. Order Miller to instruct Constant Contact to return control of the Constant Contact database to Honeywell and restore the data that Miller deleted.

3. Order Miller to preserve all documents and electronic information related to Honeywell and to the allegations in this matter.

For the reasons discussed in more detail below, Honeywell respectfully asks the Court to hear its motion *ex parte* and grant its requested emergency injunctive relief.

## SUMMARY OF THE CASE

Miller worked for Honeywell's Sky Connect business. Sky Connect communicates sophisticated logistics information to fleets of aircraft (mostly helicopters), including: location information, route guidance, and scheduling updates. Given the risks associated with flying helicopters, Sky Connect's information must be reliable. When Sky Connect

---

[2] Honeywell has filed a Proposed *Ex Parte* Order containing these provisions.

customers encounter issues, they contact a Honeywell service representative. Miller was Honeywell's principal representative for Sky Connect customers.

Unfortunately, Miller engaged in a series of wrongful acts that violated Honeywell's policies. This included misusing Honeywell confidential information to operate a personal business in which he bought and sold Sky Connect hardware from Honeywell customers for his personal benefit, inflating the prices, and falsifying documents to try hiding these transactions. Honeywell caught Miller, and terminated his employment. Once caught, Miller admitted to his wrongful conduct, but he was not done harming Honeywell. He next trained his sights on Honeywell's confidential information.

In his role at Honeywell, Miller had access to a wide array of Honeywell trade secrets, proprietary and confidential information ("Confidential Information"). This included competitive pricing information, strategic planning information, details of specific customer needs and preferences, and compilations of customer contact information. Because Miller was exposed to Confidential Information, Honeywell required him to sign an agreement in which he promised to maintain the information in confidence. Miller broke those promises, in at least the following ways:

1. Miller copied large volumes of Confidential Information from his Honeywell laptop onto personal devices;

2. In trying to get hired by a Honeywell competitor, Miller sent Confidential Information to the competitor, telling the competitor that this information could be used to compete against Honeywell by taking Honeywell's customers;

3. At the time when Miller was supposed to be returning his Honeywell-issued laptop, he was sending Confidential Information to a Honeywell competitor;

4. Before returning his Honeywell-issued laptop, Miller deleted the vast majority of the Honeywell Confidential Information that it contained;

4

5. Miller accessed Honeywell's "Constant Contact" account and copied more than three thousand customer contacts to a personal device;

6. Miller told a Honeywell competitor (a prospective employer) that he had "3000+" contacts that he would use "to reach out to gain new business"; and

7. To inflict maximum harm on Honeywell, Miller deleted all 3,000 contacts from Honeywell's Constant Contact account, and changed the access credentials so that Honeywell cannot access its own Confidential Information.

In light of Miller's extensive interaction with Honeywell's customers, Honeywell required Miller to sign a narrowly-tailored non-solicitation agreement. Miller promised not to solicit certain Honeywell customers for two years after leaving Honeywell. Miller also broke those promises. Miller reached out to a direct competitor of Honeywell, sought a job with that company, and indicated that the competitor should solicit business from specific HON customers with whom Miller worked while at Honeywell.

If Miller's conduct is not stopped immediately, Honeywell will suffer further irreparable harm. Honeywell respectfully asks the Court to preserve the status quo that existed before Miller stole Honeywell's Confidential Information.

## BACKGROUND

### Honeywell Invests Substantial Resources to Develop Customer Relations and Data

Honeywell's Aerospace division is a global leader in aviation technology. Honeywell has invested substantially in its Sky Connect product. (Ronis Dec. ¶ 1.) Sky Connect is an aviation fleet management system that provides tracking, voice and text communication, routing, and other services for aircraft (mostly helicopters). (*Id.*) The flight support services industry is competitive, with high customer standards. (Munson Dec. ¶ 5.) Customers require consistent, clear, and accurate communication with their

aircraft to operate safely and efficiently. (*Id.* ¶ 5.) If there are service outages, planned or unplanned, customers need prompt and accurate information so that their records, fleet controls, and safety standards are not compromised. (*Id.* ¶ 2; Ronis Dec. ¶ 4.)

Honeywell meets these standards by providing excellent customer service. (*See id.* ¶¶ 5, 6.) For example, Honeywell has a Sky Connect customer contact available twenty-four hours per day, seven days per week, 365 days per year. (*Id.* ¶ 6.) The customer contact—who was principally Miller—has detailed information about each customer and technical information on how Honeywell can serve those customers. (*Id.* ¶¶ 6, 8, 9.)

As part of its efforts to ensure excellent service to Sky Connect customers, Honeywell has—in addition to other systems—an independent, dedicated database of up-to-date customer contact personnel that is specifically used to communicate time-sensitive and important information to customers. (Ronis Dec. ¶ 12.) This database is housed with a third-party vendor, Constant Contact. (*Id.* ¶ 7.) Honeywell spent significant time and resources to develop and maintain a program that fulfills its customers' need for swift and accurate mass-messaging. (*Id.* ¶ 8).

**Miller Promised to Protect Honeywell's Confidential Information**

Miller was Sky Connect's key customer support person. (Munson Dec. ¶ 8.) As a condition of his employment with Honeywell, Miller signed a Honeywell Employment Agreement regarding Trade Secrets, Proprietary and Confidential Information (the "IP Agreement"). (*Id.* ¶ 19.) Miller signed the IP Agreement in consideration of his employment and other factors, including receiving Honeywell's Trade Secrets, Proprietary and Confidential Information. (*See* Complaint Ex. A[3] § 20(b)) (defining

---

[3] The Agreement is Ex. A to Honeywell's Complaint and is cited as "Agmt."

"Trade Secrets, Proprietary and Confidential Information").

In the IP Agreement, Miller agreed that he would "never, directly or indirectly, use" Honeywell's Confidential Information "except in furthering Honeywell's business," and that he would not disclose Confidential Information outside of Honeywell. (*Id.* § 6.) Miller also agreed that would not use Honeywell's Confidential Information for his "own benefit or the benefit of any third party." (*Id.*) In addition, Miller agreed to return all Confidential Information to Honeywell when his employment ended. (*Id.*) Finally, Miller promised not to solicit certain Honeywell customers for two years after leaving Honeywell. (*Id.* § 10; Munson Dec. ¶¶ 19-21.) In addition to requiring employees to sign such agreements, Honeywell takes many other measures to protect the confidentiality of its trade secrets and sensitive business information. (*See* Munson Dec. ¶¶ 22-23.)

Miller was responsible for managing Sky Connect customer relationships. Customers using Sky Connect could call or email Miller to get initial advice or assistance with their day-to-day needs. Miller could access four Honeywell databases, access data logs, and resolve many issues that customers had. (*Id.* ¶¶ 8-9.) The data to which Miller had access included complete pricing information, product capability information, and customer report data. (*Id.* ¶ 9). Miller knew that this data—which is highly valuable to Honeywell and competitively sensitive—was confidential. (Ronis Dec. ¶¶ 13-14.)

**Miller was Fired for Using Honeywell Confidential Information for Personal Gain**

Miller's Honeywell employment was terminated on February 21, 2017, after an internal investigation concluded that he used Honeywell Confidential Information contact customers and engage in the buying and selling of Honeywell products for his own profit. (Fanning Dec. ¶ 8; Ronis Dec. ¶ 9; Munson Dec. ¶ 12.) When Honeywell's investigators

7

confronted Miller with its findings, he admitted that he violated Honeywell policies in several ways, including by "using his Honeywell knowledge to contact a former customer and attempt[ing] to profit from a personal sale." (Fanning Dec. ¶ 9.)

At the meeting where Miller learned of his termination, Miller did not have his Honeywell computer, he and his supervisor, Brian Munson, arranged to turn over the device the following day: February 22, 2017. (Munson Dec. ¶ 15.) On that day, Miller called to say that he could not make the arranged meeting. (*Id.* ¶ 16.) Miller and Munson rescheduled the appointment for the following day, February 23, 2017. (*Id.* ¶ 16). Honeywell later learned that Miller used this delay to inflict further harm on Honeywell.

**Miller Stole and Deleted Honeywell Confidential Information**

During the investigation that led to Miller's termination, Honeywell's security team installed surveillance software called SpectorSoft on his Honeywell-supplied laptop. (Fanning Dec. ¶ 7.) This allowed Honeywell to investigate Miller's laptop after he finally returned it. (*See id.* ¶¶ 13-14.) Investigators initially observed that Miller deleted much of the data on the computer. However, the SpectorSoft software recorded screenshots that showed Miller's activity. (*Id.* ¶¶ 7, 14.) These screenshots show that Miller accessed the Constant Contact database and changed the account ownership information from Honeywell to Miller's personal information. (*Id.* ¶ 17.) Miller then copied the customer contacts onto his personal storage device, and then deleted all the contacts from the database. (*Id.* ¶¶ 16-17 & Ex. A-B[4].)

---

[4] Exhibits B-E to the Fanning Declaration are redacted to protect Honeywell Confidential Information and personal information of Miller and other individuals. Honeywell is willing to provide un-redacted exhibits to the Court *in camera*, or to defendant's counsel pursuant to a protective order.

By changing the Constant Contact account information, Miller locked Honeywell out of the database. (Ronis Dec. ¶ 11.) This was a direct attack on the Sky Connect business operation; it impairs Honeywell's ability to ensure that its aviation customers have safe, reliable, and up-to-date information. (*Id.* ¶ 12.)

Next, Miller connected at least two external hard drives to his Honeywell computer and copied Confidential Information to his own devices. (Fanning Dec. ¶ 18 & Ex. C.) The file names reveal that Miller copied important and valuable information, including Honeywell pricing data, folders related to important Sky Connect customers, information regarding price quotes, and other important information. (Ronis Dec. ¶ 13; Fanning Dec. Ex. C.) Miller also took information about a Request for Proposal for a particular customer, a bid for which Honeywell competed against Blue Sky Network. (Fanning Dec. ¶ 19 & Ex. D-E.) In short, Miller appears to have specifically taken information about Sky Connect's most important customers. (*Id.* ¶ 19 & Ex. F.)

Miller has already revealed Confidential Information to Honeywell competitors. (*Id.* ¶ 19.) At 1:01 p.m. on Wednesday, February 22, 2017—precisely when Miller was supposed to have returned his Honeywell computer—he was emailing Honeywell customer data to a Blue Sky Network employee. (*Id.* ¶ 19 & Ex. D-E). Later that day, Miller wrote an email to Blue Sky Network's president, saying that he had "3000+" contacts that he could use to "reach out to gain new business." (*Id.* ¶ 19 & Ex. F.)

The information that Miller stole will harm Honeywell significantly if it is given to a competitor. (Ronis Dec. ¶ 14.) With the pricing information, technical information, customer preference information, and customer contact data, Miller has accumulated information spanning across the Sky Connect business. (*Id.* ¶ 13.) If this information falls

9

into the hands of Honeywell's competitors, Honeywell will suffer profound competitive damage and further irreparable harm. (*Id.* ¶ 14.)

## ARGUMENT

Preliminary injunctive relief is designed "to preserve the status quo pending a determination of the action on the merits." *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (quotation omitted). The standard for issuing a preliminary injunction is also the standard for issuing a TRO. *Baker v. Schriro*, 2007 WL 2332546, at *2 (D. Ariz. Aug. 13, 2007). In deciding whether to grant a TRO, the Court considers four factors: (1) the likelihood of Honeywell's success on the merits; (2) the threat of irreparable harm to Honeywell; (3) the relative balance of harm to the parties; and (4) the public interest. *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, et al.*, 634 F.2d 1197, 1200 (9th Cir. 1980); *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 978 (D. Ariz. 2006).

### I.     Honeywell Will Likely Succeed on the Merits.

To succeed under the first element of this test, Honeywell need not "promise a certainty of success," but rather must show "a fair chance of success on the merits." *Best Western Int'l, Inc. v. Patel*, 523 F. Supp. 2d 979, 983 (D. Ariz. 2007) (quotation omitted). Honeywell must at least show that its "cause presents serious questions of law worthy of litigation. *Id.* "Serious questions" are those that are "substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation." *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 975 (N.D. Calif. 2006) (quotation omitted). Honeywell meets this standard.

### A. Miller Breached His IP Agreement.

Miller has stolen Honeywell's Confidential Information, provided Honeywell customer information to a competitor along with recommendations to compete for customers, and deleted Honeywell Confidential Information from a Honeywell database, preventing Honeywell from accessing it. (*See* Fanning Dec. ¶¶ 16–19 & Ex. A–F; Ronis Dec. ¶¶ 11, 13.) These actions plainly violate Miller's IP Agreement.

#### 1. Honeywell prevails under New Jersey or Arizona law.

Miller's IP Agreement provides that it is governed by New Jersey law. (Agmt. § 18.) Under Arizona's choice-of-law rules, the choice-of-law provision is "valid and effective" because the parties clearly chose New Jersey law in the IP Agreement. *See* Restatement (2d) Conflicts § 187(1); *Abogados v. AT&T, Inc.*, 223 F.3d 932, 934 (9th Cir. 2000); *Swanson v. Image Bank, Inc.*, 77 P.3d 439, 441 (Ariz. 2003).

Even if the Court looks to the law of this forum, Arizona law and New Jersey law on the enforcement of restrictive covenants do not differ in any material respect. New Jersey and Arizona enforce confidentiality and non-solicitation clauses that: (1) protect the legitimate interests of the employer; (2) impose no undue hardship on the employee; and (3) are not adverse to the public interest. *Solari Indus., Inc. v. Maladay*, 264 A.2d 53, 56 (N.J. 1970); *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1283 (Ariz. 1999). The IP Agreement meets each of these requirements.

First, an employer has legitimate business interests in protecting its trade secret, confidential, and proprietary information and maintaining its customer relationships. *See Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 33 (1971) (holding that employer has a "patently legitimate interest" in protecting trade secrets, confidential business

information, and customer relationships); *Valley Med. Specialists*, 982 P.2d at 1284) (explaining that employers have a legitimate interest "in retaining their customer base").

Second, New Jersey and Arizona courts have often found that agreements like Miller's do not impose an undue hardship on the employee. *See, e.g., U.S. Foodservice, Inc. v. Raad*, 2006 WL 1029653, at *8 (N.J. Super. Ct. April 12, 2006) (enjoining defendants from "soliciting work from customers who were active clients of the plaintiff"); *J.P. Morgan Sec. LLC v. Krich*, 2015 WL 3604199, at *2 (D. Ariz. June 8, 2015) (emphasizing that agreement restricting former employee from "soliciting customers of his former employer or making use of confidential information from his previous employment . . . ordinarily is not deemed unreasonable or oppressive").

Finally, public policy supports enforcing Miller's IP Agreement. New Jersey and Arizona courts routinely uphold two-year non-solicitation periods. *See Comm. Hosp. Grp. Inc. v. More*, 365 N.J. Super 84, 105 (N.J. Super. 2003) (rev'd on other grounds); *see also Highway Techs., Inc. v. Porter*, 2009 WL 1835114, at *3 (D. Ariz. June 26, 2009). Both states also enforce customer-based restrictions like those in the IP Agreement. *See, e.g., Klabin Fragrances, Inc. v. Hagelin & Co.*, 2005 WL 1502254, at *6 (N.J. Super. Ct. June 24, 2005); *Hilb, Rogal & Hamilton Co. v. McKinney*, 946 P.2d 464, 467 (Ariz. Ct. App. 1997). Under either state's law, Miller is bound by the IP Agreement, and Honeywell will likely succeed in showing that he breached it.

### 2. Honeywell is likely to succeed on its breach of contract claim.

In the IP Agreement, Miller promised that he would not use or disclose Confidential Information to anyone outside of Honeywell. (Agmt. § 6.) Miller also agreed that he did not have the right to use Confidential Information for his own benefit

12

or for the benefit of any third party. (*Id.*) Miller further promised to return all Confidential Information "before leaving the employment of Honeywell." (*Id.*)

Miller has breached all of these provisions. As discussed above and as shown in the Declarations filed with this Memorandum, Miller has disclosed Honeywell's Confidential Information to someone outside of Honeywell, and has used that information for the benefit of parties other than Honeywell. Namely: he provided confidential customer information to a representative of Blue Sky Network. (*See* Fanning Dec. ¶ 19 & Ex. D–E.) Miller also wrongfully kept and used Honeywell information for his own benefit by stealing documents from his Honeywell computer about pricing, customers, requests for proposals, and other information and then deleting it from his Honeywell computer. (*See id.* ¶ 18 & Ex. C.) Miller also wrongfully used Honeywell Confidential Information for his own benefit by stealing more than 3,000 customer contacts from the Constant Contact database, then deleting the database and preventing Honeywell from accessing it. (*See id.* ¶ 16–17 & Ex. A, B, C; Ronis Dec. ¶ 10–12.)

Miller also promised that he would not, for two years after leaving Honeywell, directly or indirectly solicit, or assist others in soliciting, the business of certain Honeywell customers or prospective customers. (Agmt. § 10.) Miller also breached this promise, by telling Blue Sky Network which Honeywell customers it should solicit, and by providing Blue Sky Network with Honeywell Confidential Information to help that competitor steal the customers from Honeywell. Miller also displayed his intent to commit further violations of the agreement by telling Blue Sky Network that he would send it Honeywell contacts "to reach out to gain new business." (Fanning Dec. Ex. F.)

Honeywell has evidence that catches Miller in the act of breaching his IP Agreement. Honeywell is likely to succeed on its breach-of-contract claim.

## B. Miller Misappropriated Honeywell Trade Secrets.

Honeywell is also likely to succeed on its claims that Miller has stolen Honeywell trade secrets in violation of Arizona law and the federal Defend Trade Secrets Act.

The Arizona Uniform Trade Secrets Act ("AUTSA") defines a "trade secret" broadly to include information that: (a) derives independent economic value from being secret; and (b) has been subject to reasonable efforts to maintain its secrecy. A.R.S. § 44-401(4). *See Enter. Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1064, 1068 (Ariz. Ct. App. 1999). The Defend Trade Secrets Act ("DTSA") has a similar definition. *See* 18 U.S.C. § 1839(3). A trade secret "may consist of a compilation of information that . . . gives one an opportunity to obtain an advantage over competitors who do not know of or use it." *Ehmke*, 3 P.3d at 1068.

The AUTSA and the DTSA also grant broad protection to owners of trade secrets, providing that "[a]ctual or threatened misappropriation may be enjoined." A.R.S. § 44-402(A); *see* 18 U.S.C. 1836(b)(3)(A)(i). The AUTSA's definition of "misappropriation" fits the circumstances here: the "[d]isclosure or use of a trade secret of another without express or implied consent by a person" who at "the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret…was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.* § 44-401(2)(b)(ii). The DTSA has a similar definition. *See* 18 U.S.C. § 1839(5)(B).

Arizona courts routinely safeguard the kind of trade secrets at issue here, including: pricing information, compilations of customer contact information, customer

preferences and interaction records, and other competitively valuable information. *See, e.g., Calisi v. Unified Fin. Servs., LLC*, 302 P.2d 628, 631–33 (Ariz. 2013). For example, Arizona courts have found no difficulty affording trade-secret protection to: customer lists that are an accumulation of valuable information about customers that "would not occur to persons in the trade or business," *Ehmke*, 3 P.3d at 1069; customer lists that were compiled through substantial efforts, *Prudential Ins. Co. of Am. v. Pochiro*, 736 P.2d 1180, 1183 (Ariz. Ct. App. 1987) (holding that customer list was "an important part of a business and is in the nature of a trade secret") (quotation omitted); and customer lists that were not divulged outside the business, *cf. Miller v. Hehlen*, 104 P.3d 193, 201–02 (Ariz. Ct. App. 2005) (finding that customer list was not trade secret when disclosed outside business). *See also MAI Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 521 (9th Cir.1993) (holding that customer database was trade secret).

Miller misappropriated Honeywell's trade secrets. The evidence shows that the Confidential Information that Miller took derives independent economic value from not being readily known or ascertainable by Honeywell's competitors, and that the information is extremely important to Honeywell's Sky Connect business. (*See, e.g.,* Ronis Dec. ¶ 12.) Honeywell has also showed that it has taken reasonable efforts to maintain the secrecy of its Confidential Information. (*See* Munson Dec. ¶¶ 22–24.)

Honeywell has also presented evidence that it is likely to succeed in showing that Miller misappropriated the Confidential Information, and that there is a threat that he will continue to misappropriate the Confidential Information if he is not enjoined. Honeywell has not, in any way, expressly or impliedly consented to Miller's keeping Confidential Information, providing Confidential Information to a Honeywell competitor, or

15

communicating with the competitor about using Honeywell's Confidential Information to "gain new business" for the competitor. (*See id.* ¶¶ 16, 24.)

Miller certainly knew that the Confidential Information should be kept secret. (*See* Ronis Dec. ¶ 13; Munson Dec. ¶ 24.) First, his IP Agreement defines these materials as "Trade Secrets, Proprietary and Confidential Information." (Agmt. § 20(b).) In addition, Miller worked for Honeywell in the competitive environment in which it operates and knew that the Confidential Information was closely-held by Honeywell. (Ronis Dec. ¶¶ 13-14.) Moreover, the surreptitious manner in which Miller copied the Confidential Information—and then tried to cover his tracks by "wiping" his Honeywell computer—shows that Miller knew he was acting wrongfully. Honeywell is likely to succeed on its claims that Miller misappropriated its trade secrets in violation of state and federal law.

## II. Miller Is Causing Irreparable Harm to Honeywell.

Under Arizona law, "once a protectable interest is established, irreparable injury is presumed to follow if the interest is not protected." *Compass Bank*, 430 F. Supp. 2d at 983 (quotation omitted); *Hartley,* 430 F. Supp. 2d at 983; *Inter-Tel (Delaware), Inc. v. Fulton Comm. Tel. Co.,* 2007 WL 1725349, at *7 (D. Ariz. June 12, 2007). Honeywell has clear interests in protecting its Confidential Information and customer relationships. Miller's conduct means Honeywell's interests are not being protected. Miller's conduct is causing Honeywell irreparable harm, and will continue to do so unless it is enjoined.

## III. The Balance of Harms Favors Honeywell.

In evaluating the balance of hardships, the Court must consider "the degree of harm that will be suffered by the plaintiff or defendant if the injunction is improperly granted or denied." *Auto Now Fin. Servs., Inc. v. Abdeljaber*, 2013 WL 12106927, at *3

(D. Ariz. May 23, 2013) (quotation omitted). Here, Honeywell seeks only to hold Miller to his legal obligations—and to rectify problems he has already caused. This will not unfairly burden Miller, but failure to enjoin Miller's misconduct—and letting him keep Honeywell's Confidential Information—will exacerbate the serious harm that Miller has already caused. (*See* Ronis Dec. ¶¶ 13-14.) The balance of harms favors Honeywell.

**IV.   The Public Interest Warrants an Immediate Injunction.**

The public interest is served by "protecting a company's right to proprietary information, business operations, and contractual rights." *Hartley*, 430 F. Supp. 2d at 983. In addition, enforcing restrictive covenants furthers public policy by "protecting a company's interest in its customer base from unfair competition and the protection of trade secrets and confidential information." *Id.* (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974). The public interest here favors an injunction to stop Miller's brazen misconduct, and to protect Honeywell's legitimate business interests.

## CONCLUSION

Robert Jeremy Miller's wrongdoing must be stopped, and the damage must be rectified. Honeywell respectfully asks the Court to grant its motion.

Dated: March 16, 2017

| | |
|---|---|
| OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C. | FAEGRE BAKER DANIELS LLP |
| | *s/ Randall E. Kahnke* |
| Leah S. Freed | Randall E. Kahnke |
| 2415 East Camelback Road, Suite 800 | Martin S. Chester |
| Phoenix, AZ 85016 | 90 South Seventh Street |
| | Minneapolis, MN  55402-3901 |

Attorneys for Plaintiff Honeywell International Inc.